# Flood, Appellant, *v*. Ryan.

*Wills—Charities—Death within thirty days of will—Act of April 26, 1855, P. L. 328.*

A gift will not be deemed charitable merely from the nature of the professional character of the devisee.

Where a testator devises land to a church of which he is a member and to a charitable institution maintained by the denomination of which he is a member, and provides that in case of his death within thirty days from the date of his will the property devised shall go to the bishop of the diocese in which he lives, and it appears that there was no secret agreement, promise or arrangement between the testator and the bishop as to how the latter should use the property, the devise is good to the bishop, and not in violation of the Act of April 26, 1855, P. L. 328, although the bishop acknowledges that he intends to hold the property for the church and for the institution designated in the testator's will.

Testator by his will devised as follows: " All the rest, residue and re-

mainder of my estate, real, personal and mixed, I give, devise and bequeath unto St. Teresa's Church, Broad and Catherine Streets, and St. Joseph's House for Homeless Industrious Boys on Pine Street, share and share alike, provided however in case of my death within thirty days from the date hereof I give, devise, and bequeath all my said residuary estate unto Most Rev. P. J. Ryan, Archbishop of Philadelphia, absolutely." The archbishop testified that he did not know the testator and had never heard of him before his death. He also testified that as head of the church he held the title to the church property in his diocese, and stated that in the forum of conscience he was bound to apply the property to the use of the church and the institution mentioned in the testator's will. *Held*, that the archbishop was entitled to the property, and that the provision in the testator's will did not violate the Act of April 26, 1855, P. L. 328.

MESTREZAT, J., dissents.

Argued Jan. 20, 1908. Appeal, No. 361, Jan. T., 1907, by plaintiff, from judgment of C. P. No. 2, Phila. Co., March T., 1905, No. 3,644, on verdict for defendant in case of Ann Flood v. Most Rev. P. J. Ryan, Archbishop of Philadelphia. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Ejectment for land in the city of Philadelphia. Before BARRATT, J.

The facts appear by the opinion of the Supreme Court.

The court gave binding instructions for defendant.

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were in giving binding instructions for defendant.

*William W. Porter*, with him *Eugene Raymond* and *Frederick J. Knaus*, for appellant.—The circumstances attending the execution of this will were of the very character from the results of which sec. 11 of the Mortmain act of 1855 was designed to afford protection to the heir at law: Price v. Maxwell, 28 Pa. 23; Methodist Church v. Remington, 1 Watts, 218; Gray's Est., 147 Pa. 67; Pettit v. Fretz, 33 Pa. 118.

The statute under consideration, to be made effective as a remedial statute, must be construed liberally to effectuate the remedy: Gregg's Est., 213 Pa. 260.

*John G. Johnson,* with him *J. Ashton Devereux, D. J. Callaghan* and *A. A. Hirst,* for appellee.—Not only was the devise in favor of Archbishop Ryan one to him individually, absolutely, but there was no condition imposed by testator, or accepted by the devisee, that the latter should devote the property to charitable or religious uses.

A hope or expectation on the part of the testator, not communicated to, or imposed upon, the devisee, that the latter would devote the property to charitable or religious uses, is not a devise by the testator to charitable or religious uses.

A devotion by the devisee, after the death of the testator, of the devised property to charitable or religious uses, not made in pursuance of any understanding or agreement with the testator, does not convert the devise into one for charitable or religious use, even though the devisee should confess the existence of a feeling on his part of a moral duty to make such devotion : Schultz's App., 80 Pa. 396; Hodnett's Est., 154 Pa. 485.

The English authorities are in exact accordance with the decisions of this court : Carter v. Green, 3 Kay & Johnson, 591 ; Rowbotham v. Dunnett, L. R. 8 Ch. Div. 430 ; Wallgrave v. Tebbs, 2 Kay & Johnson, 313 ; Jones v. Badley, L. R. 3 Ch. App. Cases, 362; Lomax v. Ripley, 3 Sm. & Gif. 48.

A devise is good if there is no legal duty on the part of the devisee to devote the same to religious or charitable uses.

Opinion by Mr. Justice Brown, March 23, 1908 :

. Patrick Jeffers died August 24, 1903. On the 10th of that month he executed his will, its sixth clause being : "All the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath unto St. Teresa's Church, Broad and Catherine Streets, and St. Joseph's House for Homeless Industrious Boys on Pine Street, share and share alike, provided however in case of my death within thirty days from the date hereof I give, devise and bequeath all my said residuary estate unto Most Rev. P. J. Ryan, Archbishop of Philadelphia, absolutely." The appellant, who is the sister and sole heir at law of the testator, brought this ejectment for the possession of five pieces of real estate to which the appellee claims title under the foregoing clause of her brother's will. As it

was executed less than one calendar month before his death, the contention of the appellant is that the appellee acquired no title to these properties, because the devise is not to him personally, but was manifestly intended for the use of the two charities named, and is, therefore, void under sec. 11 of the Act of April 26, 1855, P. L. 328. If it is void, what is claimed by the appellee went to the appellant under the statute as the only next of kin and heir of the testator.

Whether the appellee should become the residuary devisee of Patrick Jeffers depended upon the latter's death within thirty days of the execution of his will. Upon his death during that period the devise to the appellee became not only operative, but was without condition. The devisee took absolutely, because the testator declared that he should so take, and he took as an individual, though designated and identified as the Archbishop of Philadelphia: Hodnett's Estate, 154 Pa. 485. "A gift will not be deemed charitable merely from the nature of the professional character of the devisee:" 1 Jarman on Wills, 193.

If the testator had survived for one calendar month from August 10, 1903, his estate would have passed to the charities named. While he could not have given it to them by a will executed within that period, he could give it by one intelligently executed within an hour of his death to whom he pleased, if not then fettered with uses forbidden by the statute. It may be conceded that the hope and expectation of the testator were that if his charitable disposition of his estate should fail by his death within thirty days, it would still reach the charities through the devise to the appellee, but he gave no expression to such hope and expectation and annexed no condition to his devise. Whatever may have been the wish or expectation of the testator, the devisee is not bound by any secret trust to carry it out, but is free to dispose of the property as he pleases: Rowbotham v. Dunnett, L. R. 8 Ch. Div. 430. There could have been no understanding, express or implied, between the testator and the appellee as to what should be done with the devise, for the latter had never known nor heard of the former before his death. If the devise to the appellee had been the result of an understanding between him and the testator, that it was to be in trust for the charities

named, and the appellee had agreed that he would so take it, his obligation would be not only a moral, but a legal one, to execute the trust, if permitted by the statute. He could not, having so induced the devise, profit through his fraud by insisting that the will gives him the properties absolutely. If a bequest or devise is made in consideration of a promise to execute an invalid or unlawful trust, equity will not allow the legatee or devisee to profit by his fraud, but will raise a resulting trust in favor of the heir or next of kin of the testator. Where, however, there is no bargain between a testator and his legatee or devisee, the gift or devise will be good, although from the impulse of his own mind the legatee or devisee may intend to carry out what he believes to have been the testator's wish. See authorities cited in 28 Am. & Eng. Ency. of Law (2d ed.), 885.

From the clearly indicated intention of the testator that the two charities named should take his residuary estate, if he survived for thirty days, and from what the appellant with much force says was his manifest attempt to evade the act of 1855, by giving it to the appellee, in confidence that his wishes would be carried out, taken in connection with the testimony of the appellee, we are asked to say that the devise is not to him absolutely as an individual, but is impressed with a trust for religious and charitable uses, making it void under the statute. The appellee, called by the appellant as on cross-examination, testified with great frankness. The substance of his testimony, upon which reliance is placed for the contention that he took the devise impressed with the trust, was that he is the official head of the Roman Catholic Church of the Philadelphia diocese; that as such official head he directs the management of its organization and conducts its business; that he looks after its properties, trusts and charities; that as the official head of his church in his diocese he holds title to St. Teresa's church, a religious institution, and to St. Joseph's House for Homeless Industrious Boys, a religious charity; that though these titles are not nominally held in trust by him, they are virtually so, because they are for the benefit of religion and the people; that if money is left to him absolutely, he can keep it, but, as a bishop, on his conscience and before God, he ought to use it as he believes the dying man would

wish him to use it; that this should be understood as applying to the devise to him by Patrick Jeffers, and that he intends to devote the properties devised to him by that testator to the charities to which the testator intended them to go. There could be no fuller acknowledgment of a moral obligation, nor a stronger avowal of an intention to discharge it, but our decrees do not go out to compel the performance of a mere moral duty. In foro conscientiæ conscience is the sole chancellor, whose decrees we are as powerless to enforce as we are to provide penalities for their violation. If the will of the testator created a trust by the devise to the appellee, which, but for the act of 1855, he would be legally bound to execute, we must so declare and hold it void under the statute.

But what is the appellee's conception of his legal rights under the devise? While avowing the moral right of the charities to what was devised to him, and his moral obligation to give it to them, he does not misunderstand his legal rights, but knows that they involve no legal duty to the charities named, or to anyone else. He testifies: "The law does not impose on me to give $10,000 which I receive without any qualification by a will. I have it, it is mine. Then comes in another law, higher law, which says, 'You have received that money, you can keep it, the state has no right to interfere with you, in natural justice it is yours, but you are a bishop and you have the care of the poor and the afflicted, and you ought to use it as the moneys intended for their benefit,—though it is not mentioned in the will. . . . I received the money as in this will case. It is mine, I can use it as I please, as far as the law is concerned, and there is no prohibition, legally or otherwise— that is, by law, no ecclesiastical law, but if I have reason to believe that this man, as I did not know him, never heard of him before, has left me this money, whatever it is, for some good purpose, and because I am a bishop, then my personal conscience—it might not influence other bishops—but my personal conscience, if it is at all sensitive, would suggest to me that large sum of money or property was left to you for no personal reason; it must have been left to you as a bishop for some good purpose. Then I take that money or that property, the value of that property, and I put it into a fund which I have for religious and charitable educational or other

good purposes. This property I know was not intended for me personally, though before the law it is, and I own it and I can do what I please with it. . . . Q. Your Grace, in your examination last Friday you were asked this question : 'If a man provided in a will that all the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath unto St. Teresa's church, Broad and Catharine streets, and St. Joseph's House for Homeless Industrious Boys on Pine street, share and share alike, that language would indicate, would it not, that those were his favorite charities?' and you answered 'Yes.' You so testified, did you not ? A. That was in a conditional will. If he made a will saying, I leave these properties to these charities, I would find myself obliged legally and otherwise to give them to what they were intended for. But he makes two wills, so to speak, or he makes one will which is conditional. He says, I leave it to these charities if I survive this will for thirty days ; if I do not survive this will for thirty days, if I die before the thirty days—here is the second condition, the second will—I leave it to Archbishop Ryan. Therefore as he did not survive the thirty days, the second will or the condition mentioned in the will leaves it to me. Q. And in connection with the two charities, of course ? A. Not in connection with the two charities, because he has willed two things—first, if I live for such a time I leave it to the charities ; second, if I don't live for such a time, I leave it to Archbishop Ryan. And then I do with it as I please, by leaving it to the charities or doing anything else I please with it. As I said, I should think in such a case my personal conscience would be to give it to some charity, and I give it to that general fund. My conscience, however, would not have to bind others." The devise is understood by the appellee just as the law construes it—an absolute one—involving no legal duty to anyone from him in the enjoyment of it ; and this is the crucial test of a trust. There can be no cestui que trust, if there is no trustee to be compelled by law to be faithful.

The court below, in an opinion by its learned president judge dismissing the motion for a new trial and discharging the rule for judgment for the plaintiff non obstante veredicto, sustained appellee's title to the properties devised to him on the authority of Schultz's Appeal, 80 Pa. 396, and Hodnett's

Estate, supra.    On this appeal an effort is made to distinguish these cases from the present one, with the result, however, that we regard the first as conclusive of appellee's right to keep the properties, and that the second reaffirms the controlling principle announced in the first.

In Schultz's Appeal, a testator, wishing to bequeath his estate to charitable uses, was told by the scrivener who wrote his will that the charitable bequest would be invalid if he should die within a month, but that he might give his estate unconditionally to some person whom he could trust to carry out his wishes.    Yeakle, a bishop of the church to which he belonged, was named, and an absolute bequest made to him. The testator died within a month, and Yeakle, being informed of his death and wishes, stated he would carry them out.    In holding that there was nothing in the circumstances to fasten a trust on the legatee, and that the bequest was not within the act of 1855, we said, through Mr. Justice SHARSWOOD: " The very able and exhaustive opinions, as well of the auditor as of the learned court below, have relieved us from an examination of the English decisions upon the Mortmain act of that country.    They undoubtedly throw a clear and strong light upon the question presented upon this record.    They establish two positions: (1) That if an absolute estate is devised, but upon a secret trust assented to by the devisee, either expressly or impliedly, by knowledge and silence before the death of the testator, a court of equity will fasten a trust on him on the ground of fraud, and consequently the statute of Mortmain will avoid the devise if the trust is in favor of a charity.    But (2) If the devisee have no part in the devise, and no knowledge of it until after the death of the testator, there is no ground upon which equity can fasten such a trust on him, even though, after it comes to his knowledge, he should express an intention of conforming to the wishes of the testator. The latter proposition applies directly to the case now before us.    Reuben Yeakle, the legatee named in the will, was not present when the instrument was executed.    He had no communication with the testator, directly or indirectly, upon the subject.    The testator had long intended to leave his estate for charitable purposes.    On his death-bed he sent for a scrivener, and expressed to him his wish to have his property so

disposed of after his death. He was informed that if he should die within thirty days, such a disposition would be ineffectual, but that he might make an absolute bequest to some individual, upon the confidence and belief that when he should be informed of his wishes, he would, of his own accord, carry them out. This plan was adopted, and upon the suggestion of one of the bystanders, Reuben Yeakle, the bishop of the church to which the decedent belonged, was chosen by him. It is clear, not only from the evidence, but from the verdict of the jury in the issue of devisavit vel non, that no undue influence was exercised to procure the will. It was the testator's own free and voluntary act, and he was told 'that he could dispose of his property to a particular person unconditionally, and if that man would do it, then he could put it to those places where he wanted it; but that would be entirely at his option; he could do it or not.' Reuben Yeakle was not informed of the will until some time after the death of the testator. When informed of it he declared his intention to appropriate the money as the testator wished it to be. He said, when examined as a witness before the auditor: 'I have not seen the will, but if it gives me the absolute right to the property without condition, I should consider that I had the legal right to do with the property as I pleased. I draw a distinction in this case between the legal and moral right.' It seems very clear that the bequest in the will of Frederick Schultz to Reuben Yeakle is not within the words of the statute. There is nothing in the circumstances to fasten a trust upon him. The statute out of the way, the charities intended to be benefited would have had no claim, legal or equitable, to enforce payment by him to them. He would, in the eye of the law, be guilty of no fraud, legal or equitable, either against them or the testator, if he should, even at this day, change his intentions and apply the money to some other use. Being the absolute owner, under the will, the declaration of his intention would not be binding upon him. It is not, therefore, in the words of the statute, a bequest 'to a body politic or to any person in trust for religious or charitable uses.' Had Reuben Yeakle been present when the will was executed, or the objects of the bequest been communicated to him before the testator's death, and he had held his peace, there would have been

some ground for fastening a trust upon him ex maleficio, as in Hoge v. Hoge, 1 Watts, 163. But nothing of that kind can be pretended here."

In the foregoing case it was strenuously contended, as it is urged here, that the testator's disposition of his residuary estate was a fraud upon the law and an evasion of the act of 1855, which ought not to be permitted; but as to this it was said: "It is urged, however, that this whole plan is nothing but a contrivance to evade the statute. No doubt such was the intention of the testator. It is said that it is a fraud upon the law, and that the bequest ought therefore to be declared void. But that overlooks the fact that the absolute property in the subject of this bequest has vested in the legatee, and that he is entirely innocent of any complicity in the fraud of the testator. If the statute is practically repealed by this construction, it is evident that it must be for the legislature to devise and apply a remedy, not the judiciary, whose province is not jus dare but jus dicere." We have been referred to no case, and have found none, in conflict with this. Charitable bequests and devises have been held invalid as being in evasion of the statute, but from an examination of the cases in which such evasion has not been permitted it will be found that the bequests or devises were upon a secret trust, assented to by the legatee or devisee, expressly or impliedly, before the testator's death. If before the death of Jeffers this appellee had assented, expressly or impliedly, to a secret trust which the testator intended to create, the devise would be void under the statute. But there was no such assent and the case comes within the very words of the concluding paragraph of the opinion in Schultz's Appeal.

In Hodnett's Estate the testatrix gave one-half of the residue of her estate "to the Pastor of the St. John's R. C. Church of Altoona, Pa." In reversing the court below and sustaining the auditor, who had awarded one-half of the estate to the pastor of the church, we said: "There is nothing in the will to indicate that the bequest is, or was ever intended to be, in trust for any religious or charitable use; nor is there, dehors that instrument, a scintilla of evidence of any such trust. The auditor says, in substance, there is no evidence that appellant was present when the codicil was executed, or had

been consulted, in relation thereto, by testatrix or anyone in her behalf, or that he even knew he was to receive a legacy thereunder, nor was there any evidence of any communication whatever between him and testatrix, at any time prior to her decease, in relation to the bequest, or in regard to her wishes respecting the same; and, in summing up on this point, he finds: 'There is nothing in the case to indicate or show that the legacy in question was given in trust to "the pastor of the St. John's R. C. Church," .... or that such pastor should devote this particular legacy to charitable or religious uses or purposes.' .... It follows from what has been said, that, in the absence of any evidence, facts or circumstances, tending to fasten upon appellant a trust for either religious or charitable uses, he is entitled as legatee, in his own right, to one-half of the fund." There is nothing in this will to indicate that the devise to the appellee was to be in trust for any religious or charitable use. On the contrary, from its face it appears that the testator, anticipating that his charitable disposition of his estate might fail, directed that if it should, his property was to go to an individual, "absolutely" and unimpressed with any trust, instead of to charitable and religious uses. Dehors the will there is absolutely nothing to show that Jeffers intended anything but an absolute devise to the appellee, though there was much in Schultz's Appeal, unavailing, however, to reduce the absolute bequest or devise to a trust, in the absence of any evidence of an express or implied assent to it by the residuary legatee or devisee in the lifetime of the testator.

The assignments of error are all overruled and the judgment is affirmed.

Mr. Justice Mestrezat, dissenting:

The conclusion of the majority of the court has been reached by regarding this controversy as a contest between a cestui que trust and the trustee. If this was a bill in equity in which the church and the charity named in the testator's will were seeking to compel Archbishop Ryan to execute the trust and convey to them the estate devised to him, we would have another and altogether different question for adjudication. Even then, the archbishop would be a trustee ex maleficio if he accepted title to the property with an understanding that

he held it for the church and charity named in the will.   It is from that viewpoint that the majority of the court has considered this case and reached the conclusion that the archbishop holds an indefeasible title to the property bequeathed him in the will.

The question here, however, is not between a cestui que trust and the trustee, nor does it involve the right of a cestui que trust to enforce the provisions of a trust against a trustee. The question is whether the devise to Archbishop Ryan was in fact to him individually, or to him as trustee for the church and charity primarily given the property in the will, and therefore made to him individually to evade the Act of April 26, 1855, P. L. 328.   In other words: Did the testator devise the property in question to Archbishop Ryan, to be held and disposed of as his own individual property, and did the latter accept such title to the property ; or, in order to evade the act of 1855, did the testator devise the property to Archbishop Ryan and he accept it, to be held and used by him on a secret trust for St. Teresa's church and St. Joseph's House for Homeless Industrious Boys, the church and charity named as beneficiaries in the clause of the testator's will in which the alternative devise and bequest is made to the archbishop? If the archbishop, under the circumstances, did accept the property as trustee, is the devise void under the act of 1855?

The effect of this decision is that this court is powerless to declare invalid a devise or bequest by a testator made to evade a law of the commonwealth.   The will of the testator discloses on its face such intention, and the devisee declares under oath that he will apply the devise to the purpose clearly indicated in the will, which is absolutely and positively forbidden by the act of 1855.   The majority opinion concedes that in making the devise the testator manifestly intended to evade the act of 1855.   This court declared a testator had a like intention in using a similar clause in a will in the very recent case of Corr's Estate, 202 Pa. 391.   The opinion, however, sustains this palpable evasion of the statute because the devise, as the opinion alleges, is made to the devisee absolutely and not in trust for the charitable purposes named in the will.   The effect of the ruling is, as I conceive, that a party may perpetrate a conceded fraud upon the law and invoke the aid of the court to enforce

it. The learned judge who writes the majority opinion fails, in my judgment, to cite any authority in any jurisdiction to sustain his conclusion.

The clause in the will which gives rise to the controversy is as follows : " All the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath unto St. Teresa's Church, Broad and Catharine streets, and St. Joseph's House for Homeless Industrious Boys on Pine street, share and share alike, provided however in case of my death within thirty days from the date hereof, I give, devise and bequeath all my said residuary estate unto the Most Rev. P. J. Ryan, Archbishop of Philadelphia, absolutely." The act of 1855 avoids a devise or legacy " to any person, in trust for religious or charitable uses " if made within one calendar month of the testator's death, and escheats to the commonwealth all property " held contrary to the intent of this act." Here the death of the testator occurred within a month of the execution of the will.

Read in the light of the conceded facts, the devise in the will shows on its face a manifest intention by the testator to dispose of the residue of his estate in violation of the act. The testator was, at the date of his will and of his death, a member of St. Teresa's Catholic church. The devisee is the " Most Rev. P. J. Ryan, Archbishop of Philadelphia." Such is his official title, and he is the official head of the Roman Catholic Church of the diocese of Philadelphia. He testifies that he directs the management of the church, and "looks after its properties, its trusts and its charities." He is the official head and holds title to the properties of St. Joseph's House for Homeless Industrious Boys, and of St. Teresa's church. It appears from the archbishop's testimony that " bishops hold property in trust, but the property held in which the term in trust is not used, but virtually all the property is in trust because personally the bishop never purchased it, the people purchased it, it belongs to the people, and therefore whether the term in trust is used or not, that virtually it is in trust, so that if any of the property there mentioned was left to me, it was left in that sense in trust and held by me in trust either nominally, as is mentioned, and before the law or virtually as I have mentioned it, still it is in

trust and practically it becomes the same thing." A Roman Catholic clergyman was appointed executor to administer the estate and deliver the residue of it to Archbishop Ryan.

The will, therefore, read in the light of these facts, shows conclusively that the residue of the testator's property was devised to the archbishop with the intention, and the devisee so understands, that it shall be held and used for the church and charity named in the will. It will be observed that the testator was familiar with the provision of the act of 1855 which avoids devises made to religious and charitable uses within one calendar month of the death of the testator. This appears from the will itself. He manifestly had taken legal advice prior to making his will as to how he could legally give his property to his favorite charities and not offend the act of 1855. The primary gift is to the church and the charity, thereby indicating his desire that they should have his property. Realizing that this gift might be defeated by his death within thirty days, he provides for the contingency by devising the property to the official head and manager of the church and the charity, who also holds the title to all the property of both institutions. Being a member of the church and familiar with its discipline and the oath of the archbishop, the testator well understood, what every reasonable, sensible man would understand, that an alternative devise to the archbishop, primarily given the church and charity, would be held in trust for them by the devisee. He designates in the will the church and the charity as his favorite beneficiaries, thereby expressing his desire that they should have his property. He then resorts to the only means known to him to give them the property, if his direct devise to them should by any means fail. It is, therefore, apparent on the face of the will that the testator, in making the alternative devise to Archbishop Ryan in his official capacity as the head of the testator's church, unquestionably intended that the property devised should be held for the use of the church and the charity. On the other hand, the archbishop frankly concedes that he holds the property in trust for them. This is required by his oath as bishop and by the canonical and ecclesiastical law of the church. The archbishop himself testifies that if the property " is absolutely in his name, he is obliged by his office of bishop

and his oath of bishop to transmit that property to the people to whom it belongs, though it is absolutely in his name." The property of the church and of its charities is held by the bishop absolutely in his own name. His duty to the church and his oath of office, therefore, require him to hold all property devised to him in trust for the charities intended, although the title is in him absolutely. It must, therefore, be assumed that the testator, a member of the archbishop's church, knew of its canons and discipline, as well as of the duties imposed upon the archbishop as to property devised or conveyed to him, and hence he knew that in making this alternative devise the property first given to the charities would, if that gift for any reason failed, be held for their use. The testator's intention, therefore, was that the property should be held for the use of the church and the charity, and he knew that the archbishop would so hold it. The canons and discipline of the church and his oath of office are not a moral obligation, but a promise and perpetual pledge to the testator by the archbishop to so hold the property. This duty is recognized and acknowledged by the archbishop, who frankly tells the court that the property will be administered for the use and benefit of the charities. The case is, therefore, the ordinary one of a devise of property to a person absolutely with a promise by the devisee that he will hold it for a designated religious and charitable use. In such cases it is well established that if the testator dies within one calendar month the devise is void under the act of 1855.

Schultz's Appeal, 80 Pa. 396, and Hodnett's Estate, 154 Pa. 485, are cited and relied upon by the majority of the court. Neither of these cases, as I conceive, sustains the position. In Schultz's Appeal the devise was to an individual by name, who was the bishop of the Evangelical Association. The devisee was a relative of the testator. He, however, unlike Archbishop Ryan, had no control whatever over the property which belonged to the various charities of the church, nor did his oath of office or the discipline of his church require him to hold property, devised to him absolutely, for the use of the charities of the church. In Hodnett's Estate, the bequest was "to the pastor of the St. John's R. C. Church of Altoona, Pennsylvania." It was held that, in the absence of any evidence of

facts or circumstances tending to establish a trust for either religious or charitable uses, the legacy was a personal bequest to the pastor of the church. Chief Justice STERRETT delivering the opinion said (p. 488): " There is nothing in the will to indicate that the bequest is, or was ever intended to be, in trust for any religious or charitable ·use; nor is there dehors that instrument, a scintilla of evidence of any such trust. . . . There is nothing in the case to indicate or show that the legacy in question was given in trust to ' the pastor of the St. John's R. C. Church, . . . .' or that such pastor should devote this particular legacy to charitable or religious uses or purposes. . . . It is scarcely necessary to say that the statute cannot be evaded by any secret trust for charitable or religious uses. Anyone interested may compel the legatee or devisee to disclose any promise made by him, or facts within his knowledge, tending to prove the existence of such secret trust; and if he denies such promise, etc., proof thereof may be made aliunde. . . . It follows from what has been said, that, in the absence of any evidence, facts or circumstances, tending to fasten upon appellant a trust for either religious or charitable uses, he is entitled as legatee, in his own right, to one-half of the fund." In O'Donnell's Estate, 209 Pa. 63, we have recently considered the decision in Hodnett's Estate and declared, in a per curiam opinion written by the present chief justice, that " what was decided in that case is that in the absence of any evidence in or dehors the instrument, the law will not infer a trust for religious use merely from the professional character of an individual legatee, though it might if the legatee were an artificial body having but one character and that religious or charitable." On the other hand, Hodnett's Estate is, as shown by the opinion, authority for the doctrine that a trust can be established by " evidence, facts or circumstances, tending to fasten upon appellant a trust for either religious or charitable uses," and that proof dehors the instrument is admissible to prove a secret trust. The distinction between the cases just referred to and the case at bar is apparent. In the case at bar: (a) there is a direct devise and bequest of property to the charities named in the will; (b) the testator declares that if he dies within thirty days he makes another disposition of the same property ; (c) he gives the prop-

erty to a certain person, designating him by name and as archbishop of the diocese whose official oath and duties, as appears by his own admissions, require him to hold the property in trust for the church and the charity named in the will as the primary recipients of the bequest.

O'Donnell's Estate, 209 Pa. 63, is a recent deliverance of this court on the subject under consideration. The gift was " to Rev. Richard Kennahan, or his successor, of the St. Matthew's church, of Conshohocken, Penna., for the purpose of saying masses for myself, my now wife, Ellen, and my deceased wife, Mary." The testator died within thirty days of the date of the will. The legatee contended that the bequest was a personal one to him as compensation for services to be rendered, and, therefore, was not within the act of 1855. He, like the legatee and the majority opinion in the case in hand, cited in support of his contention Hodnett's Estate, and the statement in Jarman on Wills that " a gift will not be deemed charitable merely from the nature of the professional character of the devisee." The circumstance referred to in Schultz's Appeal, 80 Pa. 396, that the legatee had no knowledge of the bequest until after the death of the testator was also invoked to support the contention of the legatee. This court, however, declined to sustain the bequest to the Rev. Kennahan and, as stated in the syllabus, held that " while a gift to a legatee by name will not be held to be for a religious or charitable use merely from the professional character of the legatee, yet if it was to him in such character and for such use, the fact that it was to him absolutely and by name will not protect it from the operation of the act of 1855."

The decisions in other jurisdictions, like our own, condemn secret trusts created for the purpose of evading such legislation. In an extended note to Gore v. Clarke, 20 L. R. A. 465, reviewing the cases on " gifts by will as affected by promises made to the testator, and by secret trusts," the editor, citing the English cases on gifts for charity, says (p. 473) : " From the cases it may be gathered that if the will contains a sufficient expression of the testator's intention to make the devisees trustees, and the claim is made against them upon the ground that the trust is ineffectually disposed of, and it is alleged that there is a trust void as against the policy of the law,

the defendants must answer, and that if their admissions show such secret trust for charitable purposes, the court will decree a resulting trust for the heir."

In a recent leading case in New York, Fairchild v. Edson, 61 Am. St. Rep. 609, the court of appeals of that state held that a "secret trust having for its object the circumvention of the statute prohibiting a devise or bequest to religious or charitable societies within a time specified prior to the death of the testator is void, and the trustee may be declared to hold the property for the next of kin of the testator." In that case, speaking of the promise necessary to create a trust, Mr. Justice BARTLETT, delivering the opinion, said (p. 619) : "The express promise in words is not necessary—silent acquiescence and tacit consent have all the force and effect of a promise solemnly made in the presence of witnesses."

In Gore v. Clarke, 20 L. R. A. 465, it was held by the supreme court of South Carolina that a devise intended to evade the provisions of a statute, although on the face of the will an absolute gift to a stranger, will not be upheld merely because the devisee had no notice during the testator's life of the secret trust intended. In the opinion by POPE, J., it is said (p. 476) : "If he (the devisee) should disregard this palpable intention of his benefactor (not communicated to him in the lifetime of the testator), he would be lost to all shame. If he should regard it, and execute it, he thus contravenes the positive laws of his country, forbidding such a course. Under our view of the law, he shall not be required to elect either course." The court declared the trust void because it was an attempted evasion of the statute, and relieved the devisee from his embarrassing position.

We are not without direct authority to guide us in the interpretation of a devise of this character. It is the unanimous judgment of the supreme court of Missouri in Kenrick v. Cole, 61 Mo. 572. In that case the tenth clause of the will is as follows : "All the remainder, rest and residue of the estate, real, personal and mixed, whereof I shall die seised, entitled or possessed, including herein also everything which, though herein disposed of, may by lapse, or other failure in intendments of law be regarded as undisposed of, I give, bequeath and devise to Peter Richard Kenrick, of the city and county of St. Louis,

Missouri, constituting him my residuary legatee." The evidence in the case showed that, prior to the making of the present will, the testatrix made another will containing a devise to Peter Richard Kenrick in his official capacity as archbishop of the Roman Catholic Church, for the benefit of the church. After the adoption of the constitution of Missouri of 1865, forbidding a gift, devise or bequest for the use of any religious sect, the prior will was canceled and the present will was made, containing the tenth clause in favor of Peter Richard Kenrick as an individual, but with the same intent as expressed in the former will. Upon the evidence submitted the trial court found that the tenth clause of the will was made for an illegal purpose, and with the intent to evade the prohibitions of the constitution. This finding was affirmed by the Supreme Court, which held that the bequest in the second will was an attempt to evade the prohibition of the constitution, and therefore a fraud upon the policy of the law, and hence that parol testimony showing such intent and purpose was admissible. WAGNER, J., delivering the opinion of the supreme court, said (p. 577): "But it is objected that parol testimony is inadmissible to show the intentions of the testatrix and the legatee, where its effect would be to vary the terms of the written instrument; that an absolute devise or bequest in a will cannot be changed into a trust by extrinsic evidence. This objection is founded upon a wrongful application of a well-known rule of law. It is competent to attack every written instrument for fraud, and that fraud may be shown by parol testimony. A fraud upon the policy of the law, like all other frauds, may be shown, and will be set aside. An evasion of the law is a fraud upon its policy. It is an attempt to do indirectly what is directly forbidden. This case is a good illustration. It is contended that the plaintiff, as devisee, can hold the property to his own use. But he frankly says that if he obtains the property he will carry out the wishes of the testatrix. If this were allowed the prohibiting law would be a nullity. It would place the property in possession of the church in defiance of the constitution. Courts have always intervened to prohibit such practices and to prevent such evasions of the law." Our own case of Hodnett's Estate, 154 Pa. 485, announces substantially the same doctrine.

It will be observed that the Kenrick case is on all foûrs with the case in hand. There, as here, the bishop testified that while he held the property absolutely, yet he would carry out the wishes of the testatrix, which, in that case, were expressed in the former will. In the case in hand, the wish of the testator that the estate should go to a specific church and charity is disclosed in the same will as the devise to the archbishop. Here, the effect of the action of the archbishop is to place the property in possession of the church and charity in defiance of the act of 1855, as the action of Bishop Kenrick would, in the Missouri case, place the property in possession of the church in defiance of the constitution of that state. The Missouri supreme court held that such action would be an invasion of the law, and that the court would intervene to prevent it. Here, the majority opinion concedes that the devise in question is a manifest evasion of the law of Pennsylvania, and yet upholds it in defiance of the law.

This decision is of the utmost importance and of far-reaching consequences. It in effect strikes down a statute passed more than half a century ago to prevent direct, as well as indirect, conveyances and devises to religious and charitable uses. It ignores the policy of the law as settled by the legislation of this state in several acts of assembly, notably the act of 1855 and the more recent Act of June 2, 1887, P. L. 298, requiring property devised or conveyed for religious uses to be taken and held subject to the control of the lay members of the society. Speaking of the purpose of the act of 1855, Chief Justice Lewis said in Price v. Maxwell, 28 Pa. 23, 33 : "But it was apprehended, from experience in England, that persons on their death-beds might make large and improvident dispositions, even for these good purposes, and defeat the political end of the statutes of Mortmain. It was therefore provided by the statute of 9 George 2d, ch. 36, that ' no lands or tenements, or money to be laid out therein, should be given for or charged with any charitable uses whatsoever, unless by deed executed twelve calendar months before the death of the donor.' This statute has been uniformly construed by the English courts of law and equity so as to give it its full force and effect; and *by no means to give way to those disgraceful subtleties which by degrees overturned the former Mortmain acts.*

It has, in accordance with its true spirit, been construed to extend to lands devised to trustees, to sell them and convert the proceeds of sale to charitable uses, although not within the letter of the statute, which only embraced lands and tenements, or money to be laid out in lands and tenements. But to prevent fraud and evasion it was extended by construction to the proceeds of lands. In the spirit of the statute of 9 George 2d, ch. 36, and to prevent many of the mischiefs remedied by that statute, the act of April 26, 1855, was passed. There may be some difference of opinion on the question of policy involved in its enactment, but there can be no doubt that it is our duty to carry out its provisions in good faith. . . . (p. 37). The object was to protect the heirs and next of kin from large and improvident dispositions by persons on their death-beds, or when their minds were enfeebled by the hopes and fears of approaching dissolution." Other decisions of this court are to the same effect. Heretofore the court has never failed to enforce strictly the provisions of the act of 1855, as numerous cases will attest. No church or religious society has heretofore been permitted to evade or nullify the statute. Prior to this decision it was so well understood that the law of the state would not tolerate secret trusts created to evade the act of 1855, that Chief Justice STERRETT said, in Hodnett's Appeal, 154 Pa. 485, 490, that "It is scarcely necessary to say that the statute cannot be evaded by any secret trust for charitable or religious uses." Here, as the majority opinion concedes, the intention of both parties to the transaction is manifestly to evade the act of 1855. The will itself shows the intention of the testator to give the residue of his property to the church and charity named in his will. The archbishop, the devisee, admits that he holds the property for such uses. Under his admission Archbishop Ryan would commit a fraud if he applied the property to his own use and withheld it from the church and charity. His integrity and high character are a positive assurance that he will not betray the trust reposed in him. The church and charity, therefore, get the property, as intended by the testator, in plain violation of the laws of Pennsylvania.

I would reverse the court below and hold that the devise in question was within the act of 1855, and therefore void.