## Quigley's Estate

Before Van Dusen, Stearne, Sinkler, Klein, and Bok, JJ.

*Thomas A. McNab*, for executors and trustees, exceptants.

*John J. Green* and *Robert von Moschzisker*, for John G. Quigley, exceptant.

*Daniel C. Donoghue*, for Cardinal Dougherty, claimant.

*Walter B. Gibbons*, guardian for minor children and trustee for unborn issue.

VAN DUSEN, J., December 4, 1936.—By the codicil to his will testator left the residue of his estate in trust to pay the income to his son John for life, then for 20 years after the death of John to pay the income to John's children or their descendants, and at the end of that time to pay one half of the principal to such children or their descendants. The income of the other half of the principal is then to go to testator's two named sisters for life, and if John "dies without children or descendants of children

entitled to take" the sisters are to get the whole of the income. Then the income enjoyed by each sister is to be paid to her children for life; then the share of income of each child of a sister is to be paid to his children (grandchildren of the sisters) "capable by law of taking" for life; then the share of income of each grandchild of a sister is to be paid to his children (great-grandchildren of the sisters) "capable by law of taking" for life. There are cross-limitations of income between the two sisters and their descendants. (It is claimed that among these cross-limitations is one to the great-great-grandchildren of the sisters, but we do not so read it.) Upon the death of all those entitled to income, the principal is to be paid to the person who shall then be Archbishop of Philadelphia to be used for charity, and, if testator dies within one month, to the person who shall then be archbishop, absolutely. Testator did die within one month.

Unless we interpret the words "capable by law of taking" as limiting the beneficiaries to those who come within the rule against remoteness, it is apparent that some of these gifts are good, and that some of them vest at a period which is too remote. Such an interpretation presents difficulties, and yet it is also difficult to give the words any other meaning. As we have reached a conclusion which makes it unnecessary to interpret these words at this time, we will, in what follows, deal with the will as though these words had no such restrictive effect.

In many cases of this sort the court has awarded in trust for the first takers, and deferred the question of the validity of the later estates until the termination of the first estates: Whitman's Estate, 248 Pa. 285; Ewalt v. Davenhill et al., 257 Pa. 385; Lockhart's Estate, 267 Pa. 390; Jones' Trust Estate, 284 Pa. 90; Hays' Estate, 288 Pa. 348; Lockhart's Estate, 306 Pa. 394; Warren's Estate, 320 Pa. 112. In those cases it was held that:

". . . the will evidenced a dominant purpose to care for those for whom the testator had created the particular estates, and the ultimate limitations, which transgressed

the rule against perpetuities, represented a mere secondary intent not inseparably connected with the precedent estates".

The quotation is from Feeney's Estate, 293 Pa. 273, 287, in explanation of this line of cases. That case is the leading authority in the other line, in which it has been held that the estates of the first takers were:

". . . essential parts of a general scheme which ties up the vesting of the principal of the estate until a time forbidden by the rule against perpetuities."

Accordingly, the whole trust was declared void, the estates of the first takers fell with it, and an award was made to the next of kin. Kountz's Estate (No. 1), 213 Pa. 390; In re Kountz's Trust, 251 Pa. 582, are in this class. We refer also to Johnston's Estate, 185 Pa. 179, Gerber's Estate, 196 Pa. 366, and Lilley's Estate, 272 Pa. 143, with the suggestion that the facts in those cases are in a class by themselves, and that they bear little resemblance to the other cases in either line. In Johnston's Estate the fund was given in trust for 75 years, and the various limitations were spread throughout that period. In Lilley's Estate the income was to be accumulated for 99 years, and there was no gift to anyone until the end of that time. In Gerber's Estate there were certain annuities, but the bulk of the income was to be accumulated and not distributed until the youngest grandchild of the testator should become 22 years of age. These cases are much alike, and the conclusion of the court seems inescapable.

Coggins' Appeal, 124 Pa. 10, and Ledwith et al. v. Hurst et al., Execs., 284 Pa. 94, were not cases in which the estates of the first takers were stricken down because they were part of a bad scheme. The following estates were too remote; and the next of kin who took in that case were the same persons as the first takers, and there was no spendthrift trust. Accordingly, the two estates coalesced, and there was an absolute award to the persons who became thus entitled. Ledwith v. Hurst, supra, was

decided on the same day in an opinion by the same judge as Jones' Trust Estate, supra, and the cross-references show that the court considered that there was no conflict between them, as indeed there is not.

We are not called upon to compare these cases minutely or to attempt to find a criterion which will solve all cases and distinguish a scheme with a dominant purpose to exceed the rule against remoteness from a scheme with a dominant purpose to benefit the first takers. The present will has features of its own which make it clear to us that there is no dominant purpose to violate the rule against remoteness. The auditing judge so found, and we agree with his conclusion.

When we speak of "contingent" and "vested" estates, we must keep in mind what the contingency is. This will contains three different sets of contingencies.

One contingency relates to John's children, and, under any possible construction of the will, the estates in income and principal to John's children and their descendants must become vested within 20 years after John's death. This is not too remote. Half of the estate goes according to this event.

The second contingency relates to the determination of those who may be entitled to life interests among the descendants of the sisters. Here the contingency is too remote with respect to the sisters' grandchildren and great-grandchildren, but is good, of course, for the sisters and the sisters' children.

The third contingency is the ascertainment of the remaindermen, which on one theory is too remote, and on another is not. (See below.)

The second and third contingencies will determine the ultimate disposition of half the estate in any event; and will determine the disposition of the whole of it if the contingency with respect to John's children fails.

If half this scheme is good throughout, and if the first and second estates in income of the whole are good, how can we say that the whole is bad?

In the first Lockhart case, 267 Pa. 390, testatrix gave her estate in trust to pay one half of the income to her mother for life, and the other half to her stepfather, William, for life, with right of survivorship, and after the death of the survivor to pay two thirds of the income to a stepbrother, Wilmer, and the other one third to his lawful issue, and on the death of Wilmer to pay the whole income to his lawful issue and upon the death of his lawful issue then the principal was given to charity. The question arose after the death of the mother, and at the beginning of the trust for William, when the next of kin claimed that the whole trust was void. The court, however, awarded in trust for William without determining the validity of the later gifts.

After William's death the matter came up again. This court held in Lockhart's Estate, 15 D. & C. 594, that the gift to Wilmer's issue was to his issue indefinitely, that it was a gift of income only, and that not only might persons become entitled who were born after the death of the testatrix, but other persons might become entitled on their deaths, and so on ad infinitum; further, that the fund could not be split, as two thirds of the income of the whole fund was not the same as the income of two thirds of the fund, a well-established distinction. With Feeney's Estate before us, we held that the gift of one third of the income to the issue indefinitely was inextricably connected with the gift to Wilmer of two thirds, and that the whole was void; and accordingly the whole fund was awarded under the intestate laws. The Supreme Court, at 306 Pa. 394, reversed, holding that there was an intestacy of the third; but that this invalid portion was separable from the part validly given to Wilmer, and that the trust of two thirds should continue for his benefit; and the court again declined to say who might be ultimately entitled.

Under the present will we have not got that far. All the income must now go under a limitation that is good, and it must go to the next generation for 20 years under a limitation that is good.

We think it is material also to consider the changes in the provisions of the will which were made by the codicil. In the will, under one possible construction of it, the gifts to John's children were for their respective lives and the gifts over vested at their deaths. That period might be too remote because John might have children born after the testator's death. By the codicil the time of vesting was fixed at 20 years after John's death, which is not too remote. How can we say that testator's "dominant purpose" is to violate the rule against remoteness, when he takes particular pains to change his testamentary provisions so as to bring at least half of his scheme within the rule?

If testator's whole scheme is declared void, then his sisters, Mary and Lillian, whom he named, and their daughter, who grew to motherhood in his lifetime, will be entirely deprived of any benefits under this will, though what he gives to them is good in itself and easily separable from the rest. We should doubt, hesitate and be quite clear in our minds before we arrive at such a result.

We find it unnecessary to examine the validity of the gift of the principal in remainder, though we will state the respective contentions for future reference.

It is suggested on the one side that as testator died within a month the gift to charity in the codicil is ineffective, and that therefore the alternative gift takes effect to the person who may be archbishop at the end of the preceding estates, who takes in his own right: Flood v. Ryan, 220 Pa. 450. This is too remote. It is suggested on the other side that as the codicil only revokes the gift to charity in the will for the purpose of making another gift, and the codicil cuts down the gift to charity rather than increases it, therefore if the codicil falls the will stands, citing Bingaman's Estate, 281 Pa. 497, and other cases. If this is so, then the gift to charity is vested: Gageby's Estate, 293 Pa. 109; subject only to the contingency with respect to John's children, which is not too remote. These questions do not now arise.

We are asked by the exceptant, in case we find that the fund must all be kept together now for the benefit of John and his possible children, nevertheless to render a declaratory judgment declaring what part of the trust will be "bad" in the future. Reference is made to the Act of May 22, 1935, P. L. 228, sec. 7, authorizing a declaratory decree "in any civil proceeding, suit, or action, no matter how commenced, where all parties, to be affected, are actually in court or have had such notice of the proceeding, suit, or action, as is required by law, and where the court is convinced, that such a judgment or decree is appropriate and proper to be entered".

It has not been the practice of Pennsylvania courts to construe all of a will in advance, but to confine themselves to so much of it as is necessary to be considered to determine present action. We will not hesitate to render declaratory judgments when they are useful, but experience cautions us not to extend the ancient practice in other cases. We do not think such a declaratory judgment would be "appropriate and proper" at this time and in this proceeding.

There are before us the son John and the two sisters, and the children of one of the sisters, also Mr. Gibbons, who was appointed guardian ad litem for certain living minors, grandchildren of one of the sisters, and trustee for the unborn issue of John and of the two sisters and of the children of the sisters "and all other persons who may have an interest in the said Estate and are not now in being or ascertained." The guardian presented his views fully and well; but we call attention to the fact that John's possible children, the grandchildren of the sisters who were born in testator's lifetime, and the after-born grandchildren and great-grandchildren are not in the same situation, and their interests cannot properly be presented from one point of view. There also was an appearance for the present archbishop.

Though this particular case has been minutely and ably argued, it does not necessarily follow that all possible

views have been presented. We deprecate the rendering of declaratory judgments in proceedings which are essentially in rem, the primary purpose of which is to make a present award, and not to settle all things for all future time.

We quote (not for the last time) the wisdom of Mr. Justice Mitchell in Tyson's Estate, 191 Pa. 218, 224:

"Nothing sharpens the wits for the presentation of every possible view like the interest of opposing parties dealing with known facts in a genuine contest for victory. It is that which gives the superior value to the decision of a court of even moderate ability, over the ex parte opinions of the most learned and experienced counsel."

What we have said, therefore, about the possible invalidity of future estates is said only by way of inducement to the final result before us and is not to be taken as conclusive in later proceedings.

The exceptions of John G. Quigley are dismissed.

### Exceptions of executors and trustees

The principal of the estate is $477,343.06. The executors claimed commissions at four percent, and on objection by the life tenants the auditing judge reduced them to three percent. A statement was submitted to show extraordinary services as executors, and setting forth the services to be performed as trustees. The auditing judge found that the executors had not in fact rendered extraordinary services, and his decision on such a subject is conclusive in the absence of clear error. We find no such error in his judgment of the services already rendered.

But we do not think that the auditing judge gave due weight to the fact that most of the estate is to be held in trust by the accountants. The Fiduciaries Act of June 7, 1917, P. L. 447, sec. 45, requires that executors who are also trustees shall receive but one commission. In Middleton's Estate, 66 Pa. Superior Ct. 55, it was held that in awarding commissions on an executors' account their

duties as trustees must also be taken into consideration, and the commission ascribable to the extra duties should be awarded at that time, although ordinarily trustees receive their commissions only at the end of the trust.

We would ordinarily allow three percent commission in an estate of this size to executors alone. If they are to perform the duties of trustees also, it follows that they should receive something more for the labor of years in managing principal in the future. Commissions on future income alone are not sufficient. We conclude that the amount claimed by the accountants should have been allowed; and their exceptions are sustained, so far as to allow them four percent upon so much of the estate as is awarded to them in trust, and three percent on the balance. Taylor's Estate, 281 Pa. 440, is not in point, because the award was based on extraordinary services rather than the trusteeship, but we refer to our own cases of Barclay's Estate, 2 W. N. C. 447, and Rogers' Estate, 17 W. N. C. 29.

We notice Gardner's Estate, 323 Pa. 229, 240, in which the Supreme Court reduced the commissions of executors and trustees in an estate of one million dollars to three percent. That was a much larger estate and, as the opinion says: "Each case is sui generis." We do not understand the ruling to be that we must give no consideration to the fact that the accountant is trustee as well as executor.

The rule is compensation for responsibility and labor. Obviously the labor is greater if it extends over a term of years than if it is confined to the ordinary year of administration.

As above stated, the exceptions of John G. Quigley are dismissed, and the exceptions of the accountants are sustained to the extent of awarding commissions at four percent on so much of the estate as is to be held in trust, and three percent on the balance. As modified, the adjudication is confirmed absolutely.

BOK, J., dissenting.—The auditing judge has found that the accountants have rendered no unusual or extraordinary services in this estate. The majority opinion of the court confirms this finding. In view of the fact that the principal of this estate is almost a half million dollars and the fiduciaries are claiming and have been allowed five percent commissions on income, I agree with the conclusion of the auditing judge that three percent commission on the principal of the estate is adequate compensation: See Gardner's Estate, 323 Pa. 229 (1936).

I would therefore dismiss the exceptions of the accountants with respect to the question of commissions. In all other respects I concur with the majority opinion.

Judge Klein concurs in this dissent.